UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUSAN BROWN | : | |
| | : | |
| VS. | : | NO. 3:03CV420 (MRK) |
| | : | |
| REGIONAL SCHOOL DISTRICT 13 | : | |
| WILLIAM D. BRECK, | : | |
| SUSAN L. VICCARO, and | : | |
| ANN RICHARDSON | : | MARCH 8, 2004 |

## BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

This is an action by a nontenured special education teacher at the Strong

School in Durham, Connecticut, against the Board of Education, the Superintendent

of Schools, the head of the school district's special education program and the

principal of the school.  The plaintiff contends that she was subjected to disparate

discipline in comparison to all other teachers in her school and that she was

retaliated against for contacting and then retaining a lawyer.  She has brought this

action, pursuant to 42 U.S.C. § 1983, to redress violations of her Fourteenth

Amendment right to equal protection of the laws and her First Amendment right to

freedom of association.  She also asserts state law claims of intentional and

negligent infliction of emotional distress.  After they had received notice from her

lawyer of the fact of his representation of the plaintiff, the defendants initiated

termination proceedings against her and she was terminated by action of the Board at the end of the 2002-03 school year.

The defendants have moved for summary judgment.  They claim that the plaintiff did not engage in any speech protected by the First Amendment,[1] that they had sufficient non-retaliatory reasons for disciplining and later terminating her, that there is no evidence of disparate treatment of the plaintiff but that, in any event, they had a rational basis for disparate treatment, that their disparate treatment of the plaintiff was not malicious, that the individual defendants are shielded by the affirmative defense of qualified immunity, that the evidence does not support a *Monell* claim against the District, that their conduct was not "extreme and outrageous" under state law, that their conduct was not sufficiently unreasonable as a method of terminating employment to qualify for negligent infliction of emotional distress, and that they enjoy governmental immunity from the state law claims since they were engaged in discretionary acts.

"The standards governing summary judgment are well-settled.  Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits..., show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'  Fed. R. Civ. P. 56(c); *see also* Celotex Corp. v.

---

[1]  The defendants do not discuss the plaintiff's right-of-association claim.

Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.

"In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant....Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002).

When the moving party "'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing." Giannullo v. City of New York, 322 F.3d 139, 140-41 (2nd Cir. 2003), quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 158, 160 (1970).  "[T]he moving party bears the ultimate burden of establishing its right to summary judgment as a matter of law even when it does not have the ultimate burden of persuasion at trial."  Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 982 (10th Cir. 2003).

When passing upon a motion for summary judgment, the court may not resolve factual disputes or make credibility determinations, even if the case is one which eventually will be tried without a jury.  In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996).  Rather, the court must resolve any ambiguities and draw

all inferences against the moving party.  Appleton v. Board of Education, 254 Conn. 205, 757 A.2d 1059 (2000); Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991).  The evidence of the party against whom summary judgment is sought must be believed.  Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994). The court must construe the evidence in the light most favorable to the party opposing summary judgment and deny the motion unless no construction of the evidence could support judgment in the plaintiff's favor.  Appleton, supra; Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993); United States v. Certain Funds on Deposit in Scudder Tax Free Investment Account #2505103, 998 F.2d 129 (2d Cir. 1993); Union Pacific Corp. v. United States, 5 F.3d 523, 525 (Fed. Cir. 1993); Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 105 (1994); D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434 (1980); Connell v. Colwell, 214 Conn. 242, 246-47 (1990).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party.  So long as the opponent has offered

enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied.  In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433.

Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution.  R. B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997).  "If reasonable minds could differ as to the import of the evidence...and if...there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment."  Id. at 59, quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988), and In re Japanese Elec Prods. Antitrust Litigation, 723 F.2d 238 (3d Cir. 1983) (internal quotation marks omitted).

"A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.'  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Thus, '[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'"  Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir. 1997).  Citing Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

"[T]he Second Circuit has cautioned that, in cases where motive, intent or state of mind are at issue, summary judgment should be used sparingly."  Ruscoe v.

Housing Authority of City of New Britain, 259 F. Supp. 2d 160, 166 (D. Conn. 2003) (Nevas, J.), *citing* Dister v. Continental Group, Inc., 859 F.2 1108, 1114 (2nd Cir. 1988).

      The plaintiff will first address the state law issues.  The defendants' argument that they were engaged in discretionary actions and therefore are immune from liability for the intentional infliction of emotional distress or egregious conduct constituting the negligent infliction of emotional distress in the termination process cannot be supported.

      Section 52-557n(a) of the General Statutes provides: "(1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties; (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit; and (C) acts of the political subdivision which constitute the creation or participation in the creation of a nuisance; provided, no cause of action shall be maintained for damages resulting from injury to any person or property by means of a defective road or bridge except pursuant to section 13a-149.  (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any

employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." See Spears v. Garcia, 66 Conn. App. 669, 676, 785 A.2d 1181, cert. denied, 259 Conn. 903, 789 A.2d 991 (2001); Krevis v. City of Bridgeport., 80 Conn. App. 432 (2003). It is not at all clear that this statute even applies to boards of education. Section 10-235 of the General Statutes applies to boards of education specifically and requires indemnification by such boards of their employees found liable for wrongdoing.

"A public official performing a governmental duty is immune from liability as long as he acts 'in good faith in the exercise of an honest judgment and not in the abuse of...discretion, or maliciously or wantonly....'" Wadsworth v. Middletown, 94 Conn. 435, 439 (1920). Under the doctrine of governmental immunity, there is a distinction made between ministerial and discretionary acts. 'A ministerial act, as opposed to a discretionary act, refers to [an act] which is to be performed in a prescribed manner without the exercise of judgment or discretion.' Roman v. Stamford, 16 Conn. App. 2213, 221 (1988). A municipal defendant will not be shielded from liability for a negligently performed ministerial act, but he will generally be immune for a negligently performed discretionary act. Gordon v. Bridgeport Housing Authority, 208 Conn. 161, 167-68 (1988). Failure to perform discretionary

acts will create liability where the public officer's failure to act would likely subject an identifiable person to imminent harm, however.  Id. at 167....Whether the acts complained of are governmental or ministerial is a factual question.  Gauvin v. New Haven 187 Conn. 180, 186 (1982)."  Velez v. City of New London, :94CV2169(PCD) (U.S.D.C. D. Conn. 1999).

In any event, "[t]he determination of whether official acts or omissions are ministerial or discretionary is a question of fact for the fact finder."  Beach v. Regional School District Number 13, 42 Conn. App. 542, 553 (1996).

Under the recently-clarified test for "imminent harm" articulated by the Connecticut Supreme Court in Purzycki v. Fairfield, 244 Conn. 101 (1998), the risk of injury in the present case meets the "imminent harm" test.  In Purzycki, the geographical limitation extended to all the hallways of a school building.

For all these reasons, there is no basis for finding governmental immunity from the state law claims here.

Turning to the question of whether the conduct of the defendants was "extreme and outrageous" as necessary to support an action for the intentional infliction of emotional distress – much less sufficiently unusual or egregious to support the lesser claim of negligent infliction of emotional distress – there is abundant case law to support a jury verdict in the plaintiff's favor here.  The relevant facts on this issue are these:

In February of 2000, defendant Viccaro made the following written statement concerning the plaintiff:

> I first met Susan two years ago when she interviewed for a position at Memorial School....One year later I had another opening and was pleased to see Susan in the candidate pool. She was the unanimous choice of the committee.
>
> Susan...has outstanding teaching skill as well as a broad knowledge of the law. She communicates effectively with students, staff, and parents. She demonstrates initiative and works well independently as well as part of a team. She has been professional in all of her dealings throughout every aspect of her job.
>
> Susan is warm, has a good sense of humor and appears at ease in a variety of settings and with a variety of people. She is flexible, able to think on her feet and knows when to ask for help. She enjoys the students she works with and holds them to high expectations....I recommend her without reservation....

(Exhibit 4)

In March of 2000, defendant Richardson wrote that the plaintiff had been teaching special education in her building for that academic year and that during that year "I have had frequent opportunities to review her skills and oversee her hard work with students. She is an individual with a love for students, making her a fine teacher. This quality is special in that it is the basis for her caring nature and sound teaching techniques." She continued:

> This teacher has excelled within our program and is part of a team of teachers that makes things happen. This professional is very comfortable working in an inclusion type classroom, because her strong teaching techniques help her to instruct within a wide variety of instructional settings. As a firm and fair individual, she believes in

> creating situations that enable all students to succeed.  Her classroom
> is always busy with hands-on activities.  She is an advocate for her
> students, working with other staff members tirelessly to ensure
> success for everyone....She has a keen awareness of the educational
> field and is a hardworking and reliable instructor.

(Exhibit 5)

Defendant Richardson was the person who evaluated special education

teachers in her building.  The plaintiff was treated differently from them in being

evaluated by defendant Viccaro.  (Exhibit 7, pp. 30, 51)

Plaintiff's monthly and quarterly and annual evaluations in 1999 and 2000

were outstanding.  (Attachment B)  Plaintiff's evaluations throughout her second

year, 2000-01, all were excellent.  (Attachment C)  Defendant Viccaro became the

plaintiff's primary supervisor in the fall of 2001 and commenced a pattern of unfair

and unequal treatment of the plaintiff which included false accusations and blaming

the plaintiff for the failures or wrongdoings of others.  (Attachment E, including

plaintiff's five-page response)  On March 4, 2002, in response to defendant

Viccaro's unfair scapegoating of the plaintiff, the plaintiff's colleague, Laurie King,

wrote her:

> I have worked with Susan within the special education department at
> Strong School for the past three years.  I have worked closely with her
> this year, and I have gotten to know her better both personally and
> professionally.  Susan takes her work very seriously and exerts a great
> deal of time and effort to her position on the Integrated Day team.  She
> skillfully supports her students across the two grade levels working as
> a team player with her colleagues on that team.  She is conscientious
> about adhering to her students' IEP's, ensuring that the proper

10

modifications are implemented across subject areas.  I have witnessed Susan's flexibility on many occasions, adjusting her schedule even if it meant giving up her personal planning periods to consult with teachers of her special education students. Susan has worked tirelessly on test reports, staying far beyond the regular school hours when necessary. Susan makes a concerted effort to communicate with the teacher assistants, meeting with them individually and as a team, to ensure that students' plans are explained clearly and all questions are answered.  Susan takes her work seriously and demonstrates her professionalism in interactions with her principal, fellow teachers, parents, and students.  I enjuoy working with Susan very much and feel she is a true asset to the Special Education Department at Strong Middle School.

(Id., King letter)

In March of 2002, also in response to the scapegoating of the plaintiff by

defendant Viccaro, three of the plaintiff's fellow teachers – Frank Lerose, Lissa Eade

and Nancy Earls – wrote to defendant Viccaro:

We are writing in support of Susan Brown who has served as the Special Education teacher for the Green Team for the past two and a half years.  During the past few months, she has been caught in a series of unfortunate circumstances and in order that her credibility as a professional be maintained, we want to recount our experience of working over time with Susan and the students she services.

First and foremost, Susan is an enthusiastic advocate for her students. Her persistence and vigilance have even earned the affectionate nickname of "The Haunt."  To say that she is in daily communication with each of us is a gross understatement.  She catches us in hallways, at lunchtime and because she is usually here until 5:00, often after school.  The intent of the conversation is always the same, to do whatever is necessary in order for her students to meet continued success.  Working with a team that is creative, energetic and often moving in many directcions can be a challenge but Susan's sense of humor and enthusiasm keep us grounded and focused.

11

Susan's role demands communication on a daily basis with a multitude of people and on a variety of levels. She assumes contact with parents, students, aides, the building principal, her counterparts on the other teams, and her own team members. Most of her parent contact is early and preventative. She heads off problems almost before they arise. She is sensitive to the needs of the aides and is constantly looking for ways to increase their involvement with students. Lastly, she is an active and integral part of our team in every way.

This has been a difficult year for Susan and we have tried to offer her support as she struggled with some situations which were out of her control. In spite of these difficulties, she has conducted herself as a consummate professional who cares about her students, her team and her school community. As a team, we respect her dedication and her integrity and look forward to working with her as we continue our mission of providing quality educational experiences for all students.

(Id., Letter of Lerose, Eade and Earls)

Special education teachers were habitually absent from department meetings, to the actual knowledge of defendant Viccaro. Only the plaintiff was reprimanded for being absent, however, and the one occasion when she was absent was, as defendant Viccaro well knew, for medical reasons. Nevertheless, only the plaintiff was reprimanded. (Attachment G) Defendant Viccaro continually held the plaintiff to different and higher standards than she did other teachers in the same position. (Ibid.) Plaintiff's professional colleagues observed and commented upon the disparate treatment to which the plaintiff was regularly subjected by the defendants. (Ibid.)

Only the plaintiff, out of all the teachers under Viccaro's control, was required to go to the Central Office to review materials. (Ibid.) Only the plaintiff was

subjected to abuse for following district procedures to turn to her supervisors for supervision and guidance. (Ibid.) Clerical and support staff at Strong School, being mostly neighbors in the same small town, habitually gossiped and breached confidentiality regarding special education students. When the plaintiff objected to such improprieties, she was treated rudely by the staff members. Then defendant Viccaro knowingly blamed the plaintiff for the misconduct of those clerical and support staff members which the plaintiff was powerless to prevent or control. (Ibid.)

Prior to the occasion when defendant Viccaro reprimanded only the plaintiff for missing a meeting, the plaintiff had gone three years without missing a single meeting. (Attachment R, 5/20/03 transcript, p. 92) Plaintiff had to miss a meeting because she was in the midst of another important meeting, this one a lengthy after-hours meeting with a special education student. (Id., pp. 92-93) The plaintiff is the only teacher ever required to report to the central office to review documents as punishment for missing a meeting. (Id. pp. 136-37) Defendant Viccaro considered this to be a disciplinary action against the plaintiff. (Id. p. 138)

On March 3, 2003, defendant Breck received a letter from three of the tenured teacher members of the plaintiff's teaching team at Strong School, advising him that the team's students had scored impressive gains on the Connecticut Mastery Tests which they attributed to the plaintiff's outstanding teaching. (Id. pp. 78-86) Dr. Debra Brown-Norco, a pediatrician who was the parent of one of the

plaintiff's students in 2002-03, considers the plaintiff responsible for dramatic

improvement in the educational performance of her daughter.  (Id. pp. 101-04)

Janice Ann Wenzel, a tenured teacher at Strong School who worked closely with the

plaintiff, found the plaintiff to be an excellent teacher whose skills did not decline in

any way during the years she taught at Strong.  (Id. pp. 107-14)  Attorney Fred

DeCaprio, who is the Chief Public Defender for the Hartford Judicial District, is the

parent of one of the plaintiff's students.  He considers the plaintiff to be "a terrific

teacher" in every respect.  (Id. pp. 115-17)  Linda Eade, a tenured teacher at Strong

School and one of the plaintiff's colleagues, testified that she feels "very strongly

that Sue has been an incredible contribution to our team.  She's made a

tremendous difference....[T]he students that she has worked with have been

extremely successful and these were...students with some very difficult learning

problems....[S]he has done a great job of really putting the students first and trying

to assist every student in being successful.  And she's worked very well with our

team...and...as a result her students have been extremely successful.  And the

PPTs I sat in, every single parent, especially those for the eighth grade,

acknowledged Sue for the difference she has made in their child's success at

Strong School...."  (Id. pp. 122-25)

　　　　Nancy Earls, another tenured teacher at Strong School and one of the

plaintiff's colleagues who has had daily professional contact with her, testified that

the plaintiff "is a consummate advocate" for her special education students.  She has found the plaintiff to be an "excellent" educator and communicator who sets high standards for her students and enables them to meet those standards.  (Id. pp. 142-45)  Ms. Earls personally observed defendant Viccaro picking on the plaintiff and subjecting her to a degree of disparagement and hostility which Ms. Earls had never seen with any other teacher.  (Id. pp. 154-56, 160-62)  Ms. Earls also has observed Viccaro and Richardson attempting to trap the plaintiff by giving her contradictory instructions and subjecting her to criticism or discipline when she follows one set of instructions rather than the other.  (Id. p. 163)

The defendants subjected the plaintiff to abusive and disrepectful treatment on a virtually constant basis.  (Exhibit 6, ¶¶ 2, 3c and attachment)  In April of 2001, defendant Richardson stated publicly concerning the plaintiff that she was going to "have her head."  (Id. ¶ 3a)  Although defendant Viccaro's usual method of communicating with teachers was orally, she treated the plaintiff differently and placed every communication in writing.  (Ibid.)  Defendant Viccaro ordered the plaintiff to make alterations on test reports which she did not require of other teachers.  (Ibid.)  Defendant Viccaro required the plaintiff to submit test reports within 48 hours, whereas she did not impose that requirement on other teachers.  (Ibid.)  The defendants subjected the plaintiff to constant, daily, petty harassment.  (Id. ¶ 3c)

All of the negative memos in the plaintiff's personnel file were not present in that file when it was checked in March of 2002.  They were backdated and placed there in March of 2003.  (Id. ¶ 3d)  The defendants Viccaro and Richardson constantly badgered and demeaned the plaintiff, making false accusations and berating the plaintiff when she would not "confess" to those false accusations.  (Id. pp. 86-88)  Defendant Viccaro admitted to the plaintiff's union representative that she was treating the plaintiff differently from all other teachers with respect to disciplinary matters.  (Id. p. 88)  Defendants Viccaro and Richardson constantly cited the plaintiff, in memos and in meetings, for things which were done by all the teachers in the building; but only the plaintiff was criticized for them.  (Id. p. 97)

Defendant Breck told the plaintiff that the reason he was asking the Board of Education to refuse to renew her contract was because he had been asked to do so by defendants Viccaro and Richardson.  (Id. p. 103)

Defendant Richardson has several times actually yelled at the plaintiff in the school hallways and ordered her in to meetings in the presence of support staff and colleagues.  (Id. pp. 118-19)  Defendant Viccaro would summon the plaintiff to meetings and force her to sit in the waiting area in full view of colleagues and support staff, as a way of letting them know the plaintiff was being disciplined.  (Id. p. 119)  No other teacher at Strong School was subjected to the sort of treatment inflicted upon the plaintiff.  No other teacher was constantly called into meetings.

No other teacher was scrutinized the way the plaintiff was.  (Id. p. 122)  Whereas defendant Viccaro disciplined the plaintiff for missing a single meeting, another teacher who missed the very same meeting was not disciplined in any way, yet the plaintiff had had a legitimate reason for missing the meeting and the non-disciplined teacher had simply forgot about it.  (Id. pp. 123-24)

The plaintiff suffered constant and very severe emotional distress, with physical illnesses as a component, because of the treatment she received from the defendants.  (Id. pp. 125-28)  The manner in which the defendants informed the plaintiff of their intention not to renew her contract was unique and different from the manner in which all other nonrenewed teachers were informed.  The plaintiff was simply sent a letter by defendant Breck, whereas all the others were called in for informal meetings with defendants Viccaro and Breck.  (Id. pp. 129-30)

In Benton v. Simpson, 78 Conn. App. 746 (2003), a supervisor's repeatedly telling three subordinates that they "made him sick" and were a "cancer" in the company not only was sufficiently extreme and outrageous to justify litigation but was sufficient to establish probable cause for a $500,000 attachment of the supervisor's personal assets.  In Brown v. Ellis, 40 Conn. Sup. 165 (1984), the plaintiff's job supervisor had given him work assignments in disregard of his fear of heights.  In Mellaly v. Eastman Kodak Co., 42 Conn. Sup. 17 (1991), the plaintiff's supervisor had taunted him about his alcoholism.  In Centi v. Lexington Health Care

Center, 1997 Conn. Super. LEXIS 1202 (Licari, J.), the court held that the actions of

the defendant in terminating the plaintiff's employment were sufficiently extreme and

outrageous to be submitted to a jury for determination because the termination of

employment was accompanied by a change of work assignments, the setting of

unrealistic goals for the employee, the supervisor's coming to the employee's house

on a Sunday, and the giving of pretextual reasons for termination.  In Nance v. M.D.

Health Plan, Inc., 47 F. Supp. 2d 276 (D. Conn. 1999), the court held that an

employer's questioning that signaled to others its belief that the plaintiff was a

homosexual could be found sufficiently "extreme and outrageous" in the eyes of a

jury to constitute a basis for a finding of intentional infliction of emotional distress.  In

Caesar v. Hatford Hospital, 46 F. Supp. 2d 174 (D. Conn. 1999), the court held that

an employer's acts in discriminating against the plaintiff and making false reports

regarding her to the Department of Public Health were sufficiently "extreme and

outrageous" to state a claim for intentional infliction of emotional distress.  In

Kennedy v. Coca-Cola Bottling Co. of New York, Inc., 170 F. Supp. 2d 294, 298 (D.

Conn. 2001), the court held that the actions of an employer in disclosing to the

employees and supervisors involved in wrongdoing the plaintiff's complaints that

they had engaged in a variety of illegal or improper activities at the workplace, with

the result that the plaintiff suffered retaliation and harassment, was conduct

sufficiently "extreme and outrageous" to go to a jury.  In Rosten v. Circuit Wise, Inc.,

18

7 C.S.C.R. 1147 (1992), an employer discharged the plaintiff because of her union organizing activities.  In Desardouin v. United Parcel Service, Inc., 285 F. Sup. 2d 153, 161 (D. Conn. 2003), the court held that comments by the defendant's driver, made in the presence of the plaintiff's customers, suggesting that the plaintiff was a poor credit risk and arguably making racially demeaning references to him, could be found "extreme and outrageous" so as to survive a motion for summary judgment.  A job supervisor's false accusation of lying, made in the presence of one of the plaintiff's fellow employees, is sufficiently "extreme and outrageous" to warrant submitting the case to the jury.  Musacchio v. Cooperative Educational Services, 1995 WL 681664, 1 Conn. Ops. 1319 (1995).  Cf., Decampos v. Kennedy Center, Inc., 1990 WL 264687 at * 4 (1990).  A cause of action for intentional infliction of emotional distress was stated in an employment context when the plaintiff alleged that his supervisor "severely harassed and mistreated [him], and created a situation where he was denied effective assistance in the performance of his job, open communication and fairness, unfairly placed on a 60-day performance improvement plan and then constructively fired."  Grossman v. Computer Curriculum Corp., 131 F. Supp. 2d 299, 310-11 (D. Conn. 2000).  An allegation that an employer framed an employee for theft, terminated her with that as an excuse, and then publicly branded her a thief was sufficiently extreme and outrageous to survive a motion to strike in White v. Thornton Oil Corp., 32 Conn. L. Rptr. No. 14, 505 (2002); and later, in a

ruling by a different judge, to survive a motion for summary judgment in <u>White v.</u>
<u>Thornton Oil Corp.</u>, 36 Conn. L. Rptr. No. 8, 279 (2004).  In <u>Talit v. Peterson</u>, 44
Conn. Sup. 490, 497-98 (1997) (Blue, J.), the allegation that the defendants had
subjected the plaintiff, a coworker, to unjustified criticism and caused her to lose her
job for filing a grievance was held sufficiently extreme and outrageous to survive a
motion to strike.  Terminating an employee in retaliation for his union activities has
been held to be sufficiently "extreme and outrageous" to support a jury verdict and
award of substantial damages for intentional infliction of emotional distress.
<u>Mihalick v. Cavanaugh</u>, 26 F. Supp. 2d 391, 396 (D. Conn. 1998).  Assigning the
plaintiff to a work station close to that of a co-employee who had threatened her and
whom she feared was held sufficiently "extreme and outrageous" to survive a motion
to strike in <u>Karanda v. Pratt & Whitney Aircraft</u>, 24 Conn. L. Rptr. 521 (1999).

　　　　All of these cases found the conduct alleged to be such that a jury
representing a fair cross-section of the community should determine whether it was
"extreme and outrageous" as required by the law.  Ultimately, it is a community
standards test that applies.  For a court to strike a complaint at the pleading stage,
or to grant summary judgment prior to trial, constitutes a judicial determination as a
matter of law that the alleged conduct is acceptable in our society.  In any case
where it is not obvious that the conduct *is* acceptable, the court should defer to the

collective wisdom of the jury.  Faraclas v. Botwick, 32 Conn. L. Rptr. No. 11, 414 (2002).

Other jurisdictions agree with Connecticut's prevailing view that a very wide range of human interaction, when presented as the tort of intentional infliction of emotional distress, can withstand a motion to dismiss.  *E.g.*, Alcorn v. Anbro Engineering, Inc., 2 Cal. 3d 493, 468 P.2d 216 (1970) (racial taunting by a supervisor); Contreras v. Crown Zellerbach Corp., 88 Wash. 2d 735, 741 (1977) (racial jokes by a supervisor); Carroll v. Beyeriche Landesbank, 125 F. Supp. 2d 58 (S.D.N.Y. 2000) (sexual harassment of a female employee); Akers v. Alvey, 338 F.3d 491, 496-97 (6th Cir. 2003) (sexual harassment by supervisor); Patterson v. Xerox Corp., 901 F. Supp. 274, 279 (N.D. Ill. 1995) (harassment of pregnant employee by supervisor); Pavilon v. Kaferly, 204 Ill. App. 3d 235, 149 Ill. Dec. 549, 561 N.E.2d 1245, 1251 (1990) (employer pressured employee for dates, offered her money for sexual favors, and threatened to rape or kill her); Milton v. Illinois Bell Tel. Co., 101 Ill. App. 3d 75, 56 Ill. Dec. 497, 427 N.E.2d 829, 832 (1981) (employer engaged in pattern of harassing employee to force her to falsify work reports); Wilson v. Monarch Paper Co., 939 F.2d 1138 (5th Cir. 1991) (reassigning a college-educated executive to perform janitorial duties); Shubbe-Hirt v. Baccigalupi, 94 F.3d 111 (3d Cir. 1996) (supervisor's verbal abuse of female subordinate after telling fellow supervisors he was going to "trim her bush").  Often, it is not the discrete,

individual acts that rise to the level of extreme and outrageous conduct, but the pattern of such discrete acts that does so.  *E.g.*, <u>Davignon v. Clemmey</u>, 322 F.3d 1, 6-7 (1st Cir. 2003) ("a long and relentless campaign of harassment and intimidation").

This court does not "sit as a seventh juror."  The plaintiff has a right to have a jury determine whether the conduct in question is sufficiently outrageous to justify an award of damages.  <u>Berry v. Loyseau</u>, <u>supra</u>, 223 Conn. at 807; <u>Mather v. Griffin Hospital</u>, 207 Conn. 125, 138 (1988).

Turning to the plaintiff's federal claims, the first is her claim for First Amendment retaliation.  The defendants mistakenly characterize this as a free speech claim, but in reality the claim that she was punished for consulting with or retaining a lawyer is a freedom of association claim.

The First Amendment protects, of course, the right of "expressive association" -- "the right of individuals to associate for purposes of engaging in activities protected by the First Amendment, such as speech, assembly, the exercise of religion, or petitioning for the redress of grievances" -- as well as the expression itself.  <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 617-18 (1984); <u>City of Dallas v. Stanglin</u>, 490 U.S. 19, 23-25 (1989); <u>Sanitation and Recycling Industry, Inc. v. City of New York</u>, 107 F.3d 985, 995-96 (2d Cir. 1997).

The First Amendment protects the rights of employees to associate and participate in labor unions. Smith v. Arkansas State Highway Employees, Local 1315, 441 U.S. 463, 464 (1979). A state employer may not retaliate against an individual, such as by terminating his or her employment, because of his or her union activities. Id. at 465; Henderson v. Huecker, 744 F.2d 640, 644-45 (8th Cir. 1984); Mihalick v. Cavanaugh, 26 F. Supp. 2d 391 (D. Conn. 1998); Stellmaker v. DePetrillo, 710 F. Supp. 891 (D. Conn. 199). See Clue v. Johnson, 179 F.3d 57 (2d Cir. 1999) (holding that union activists had a First Amendment associational right to advocate for the rights of minority members of the union, but sparing the defendants from liability just this once because the right was thought not to have been clearly established at the time).

"The courts have repeatedly held that discrimination against public em-ployees because of their union membership is actionable under section 1983. See, e.g., Thomas v. Younglove, 545 F.2d 1171 (9th Cir. 1976); Lontine v. VanCleave, 483 F.2d 966 (10th Cir. 1973); Orr v. Thorpe, 427 F.2d 1129 (5th Cir. 1970)." DeLoreto v. Ment, 944 F. Supp. 1023, 1034 (D. Conn. 1996). Cf., International Association of Firefighters, Local No. 3808 v. City of Kansas City, 229 F.3d 969 (8th Cir. 2000); Springdale Education Association v. Springdale School District, 133 F.3d 649 (8th Cir. 1998); Local 749, AFSCME, Council 4, AFL-CIO v. Ment, 945 F. Supp. 30 (D. Conn. 1996). However, loudly blowing a borrowed truck's airhorn during the

23

mayor's inaugural speech, in support of fellow picketing police officers, is neither speech nor protected association.  Meaney v. Dever, 326 F.3d 283 (1st Cir. 2003).

Winik-Nystrup v. Manufacturers Life Ins. Co., 8 F. Supp. 2d 157 (D. Conn. 1998) (Arterton, J.), involved an employee discharged for taking a vacation with a friend who worked for a competitor of her employer.  The suit arose in the context of a state statute prohibiting private employers from infringing the First Amendment rights of their employees.  The court, denying the defendant's motion for summary judgment, noted that there are two forms of association protected by the First Amendment:  intimate association and expressive association.   Citing Roberts v. United States Jaycees, 468 U.S. 609 (1984).  The court noted a paucity of authority about what protection is afforded in the areas where these two concepts overlap, such as dating and what the Seventh Circuit has called "chit-chat":  "[B]ecause chit-chat is important to the participants,...the freedom to engage in it is an aspect of liberty protected by the due process clause, along with the freedom to exercise other harmless liberties....[A] law that forbade dating or, for that matter, forbade an off-duty policeman to offer a ride on his motorcycle to a coed -- all of these hypothetical laws would infringe liberty.  If arbitrary, they would be deemed to violate 'substantive due process,' the term for the protection that the due process clause has been held to extend to substantive rights not listed in the Bill of Rights.  Some of these nonenumerated substantive liberties receive broader protection ... under such

24

rubrics as 'right of privacy,' 'fundamental right,' and 'right of association' in a nonexpressive sense.  And sometimes these 'fundamental rights' pop up in the employment setting and when they do it is sometimes suggested -- erroneously in light of <u>Roberts</u> and <u>Stanglin</u> -- that the First Amendment protects nonexpressive association."  <u>Swank v. Smart</u>, 898 F.2d 1247, 12151-52 (7th Cir. 1990).  Quoted in <u>Wionik-Nystrup</u> at 162.  Citing <u>City of Dallas v. Stanglin</u>, 490 U.S. 19 (1989) (holding that an ordinance limiting the use of dance halls to persons between the ages of 14 and 18 did not violate the right of association).

Denying the defendant's motion for summary judgment, the court held that the defendant's attempt to distinguish between the rights of expressive and intimate association, holding that the twain never could meet, was unsupported in both fact and law.  Some intimate association also is expressive; and it plainly is not true that intimate association has no constitutional protection.  "Dating and other social relationships are worthy of some protection under the first amendment, even though these activities may lack an overt political, religious or educational purpose.  We do not limit protection to words that are 'strident, contentious, or divisive,' but extend it to 'quiet persuasion, inculcation of traditional values, instruction of the young, and community service.'  Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty.  We conclude that dating and other social associations to the extent that they are expressive are not excluded from the

safeguards of the first amendment."  Ibid., quoting IDK Inc. v. County of Clark, 836

F.2d 1185, 1194 (9th Cir. 1988), and Roberts, supra, 468 U.S. at 636 (O'Connor, J.,

concurring).  Having insufficient information about the details of the relationship

between the plaintiff and her friend in the case at bar, and noting that the burden in

the case of the summary judgment motion was upon the defendant, the court

denied the defendant's motion.

"The right to intimate association is protected by both the First Amendment

and the Due Process Clause of the Fourteenth Amendment to the Constitution.

Adler v. Pataki, 185 F.3d 35, 42 (2d Cir. 1999).  Where the state seeks to penalize

an employee with loss of a job on account of the employee's intimate relationship

with another, the First Amendment, and not the Due Process Clause, is the proper

Constitutional vehicle through which an aggrieved employee may seek redress.  See

Id. at 44.

"The First Amendment protects freedom of expression and intimate associa-

tion.  Board of Directors of Rotary Intern. v. Rotary Club of Duarate, 481 U.S. 537,

545-47 (1987).  That protection, however, is not absolute.  Board of Comm'rs,

Wabaunsee County v. Umbehr, 518 U.S. 668 (1996).  Its force weakens when the

citizen who claims to have suffered the Constitutional loss is a public employee, and

the government defends its action in the name of the public good....In such

circumstances, courts are required to seek a balance between the interests of the

employee in the intimate association, as a citizen, against and the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees....In striking this balance, '[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.' Waters v. Churchill, 511 U.S. 661, 675-76 (1994). Consequently, deference must be accorded the state's reasonable assessment of its interests." Kelly v. City of Meriden, 120 F. Supp. 2d 191, 196-97 (D. Conn. 2000) (Covello, C.J.).

The defendants' further claim that they had sufficient nonretaliatory reasons for terminating the plaintiff's employment involves a pure dispute of fact which cannot be decided on summary judgment. The facts summarized above, and in the plaintiff's Local Rule 56 Statement, adequately demonstrate that there was no legitimate nondiscriminatory basis for her termination. Moreover, contrary to the defendants' claim, there is substantial evidence that her termination was the direct result of her association with her attorney. On November 12, 2002, Attorney Leon M. Rosenblatt wrote to the defendant Viccaro a "personal & confidential" letter informing her that the plaintiff had associated herself with him in an effort to put an end to harassment in the workplace. (Attachment I) That letter was received by defendant Viccaro on November 13, 2002. (Ibid.) Defendant Viccaro did not reply

to that letter.  Instead, she gave it to defendant Breck, who responded to Attorney

Rosenblatt, with copies to defendant Viccaro and Attorney Thomas Sullivan, on

November 18, 2002.  (Exhibit 1)  Attorney Sullivan represented the defendants in

the termination proceedings subsequently initiated against the plaintiff.  (Attachment

R)  After Attorney Rosenblatt's letter of November 12, 2002, the level of hostility

directed against the plaintiff by the defendants noticeably increased.  (Exhibit 6, ¶

3a)  At 11:23 a.m. on March 3, 2003, defendant Viccaro received a fax from

Attorney Rosenblatt requesting the plaintiff's entire personnel file.  (Exhibit 2)

Defendant Viccaro replied to that fax with a fax which she transmitted to Attorney

Rosenblatt at 3:06 p.m. on March 3, 2003.  (Exhibit 3)  In her fax to Attorney

Rosenblatt, defendant Viccaro stated that the plaintiff's personnel file would be

made available to him on March 5, 2003.  (Ibid.)  Also on March 3, 2003, defendant

Breck prepared an unsigned letter to the plaintiff ordering her to appear at a meeting

on March 5, 2003, "to discuss my decision to recommend to the Region 13 Board of

Education that your contract of employment not be renewed...."  (Attachment O)  It

is reasonable to infer that defendant Breck's unsigned letter to the plaintiff was

prepared after receipt of Attorney Rosenblatt's morning fax on March 3, 2003.

(Attachment O; Exhibit 2)

　　　　Concerning the plaintiff's equal protection claim, the material evidence also is

in dispute.  Special education teachers were habitually absent from department

meetings, to the actual knowledge of defendant Viccaro.  Only the plaintiff was reprimanded for being absent, however, and the one occasion when she was absent was, as defendant Viccaro well knew, for medical reasons.  Nevertheless, only the plaintiff was reprimanded.  (Attachment G)  Defendant Viccaro continually held the plaintiff to different and higher standards than she did other teachers in the same position.  (Ibid.)  Plaintiff's professional colleagues observed and commented upon the disparate treatment to which the plaintiff was regularly subjected by the defendants.  (Ibid.)

Only the plaintiff, out of all the teachers under Viccaro's control, was required to go to the Central Office to review materials.  (Ibid.)  Only the plaintiff was subjected to abuse for following district procedures to turn to her supervisors for supervision and guidance.  (Ibid.)   The plaintiff is the only teacher ever required to report to the central office to review documents as punishment for missing a meeting.  (Id. pp. 136-37)  Defendant Viccaro considered this to be a disciplinary action against the plaintiff.  (Id. p. 138)

Nancy Earls, another tenured teacher at Strong School and one of the plaintiff's colleagues who has had daily professional contact with her, testified that she personally observed defendant Viccaro picking on the plaintiff and subjecting her to a degree of disparagement and hostility which Ms. Earls had never seen with any other teacher.  (Id. pp. 154-56, 160-62)  Ms. Earls also has observed Viccaro

and Richardson attempting to trap the plaintiff by giving her contradictory instructions and subjecting her to criticism or discipline when she follows one set of instructions rather than the other.  (Id. p. 163)

Although defendant Viccaro's usual method of communicating with teachers was orally, she treated the plaintiff differently and placed every communication in writing.  (Plaintiff's Interrogatory Answers)  Defendant Viccaro ordered the plaintiff to make alterations on test reports which she did not require of other teachers.  (Ibid.) Defendant Viccaro required the plaintiff to submit test reports within 48 hours, whereas she did not impose that requirement on other teachers.  (Ibid.)  The defendants subjected the plaintiff to constant, daily, petty harassment.  (Id. ¶ 3c)

Defendant Viccaro admitted to the plaintiff's union representative that she was treating the plaintiff differently from all other teachers with respect to disciplinary matters.  (Exhibit 7, p. 88)  Defendants Viccaro and Richardson constantly cited the plaintiff, in memos and in meetings, for things which were done by all the teachers in the building; but only the plaintiff was criticized for them.  (Id. p. 97)

Defendant Richardson has several times actually yelled at the plaintiff in the school hallways and ordered her in to meetings in the presence of support staff and colleagues.  (Id. pp. 118-19)  Defendant Viccaro would summon the plaintiff to meetings and force her to sit in the waiting area in full view of colleagues and support staff, as a way of letting them know the plaintiff was being disciplined.  (Id.

30

p. 119)  No other teacher at Strong School was subjected to the sort of treatment inflicted upon the plaintiff.  No other teacher was constantly called into meetings.  No other teacher was scrutinized the way the plaintiff was.  (Id. p. 122)  Whereas defendant Viccaro disciplined the plaintiff for missing a single meeting, another teacher who missed the very same meeting was not disciplined in any way, yet the plaintiff had had a legitimate reason for missing the meeting and the non-disciplined teacher had simply forgot about it.  (Id. pp. 123-24)

The manner in which the defendants informed the plaintiff of their intention not to renew her contract also was unique and different from the manner in which all other nonrenewed teachers were informed.  The plaintiff was simply sent a letter by defendant Breck, whereas all the others were called in for informal meetings with defendants Viccaro and Breck.  (Id. pp. 129-30)

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  Village of Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 1073, 1074-75 (2000).  Citing Sioux City Bridge Co. v. Dakota County, 260 U.S. 441 (1923); Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 340, 352 (1918).  Expressly endorsing the concept of equal protection for the so-called "class of one" and emphatically rejecting any idea that motivation is

relevant to the equal protection analysis, the court articulated the standard:  "Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  120 S. Ct. at 1074.  Citing Sioux City Bridge Co. v. Dakota County, 260 U.S. 441 (1923); and Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty., 488 U.S. 336 (1989).  All that a plaintiff need prove is (1) intentional disparate treatment and (2) lack of a rational basis for the disparity.  528 U.S. at 564.

Holding precisely that, this court has summarized the present state of Second Circuit equal protection law:  "Before Olech, the Second Circuit permitted selective enforcement claims based on a 'class of one' if the plaintiff could 'show both (1) that [he was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  Russo v. City of Hartford, 184 F. Supp. 2d 169, 190 (D. Conn. 2002) (Hall, J.), citing Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).  "In Harlen, the Court of Appeals assumed without holding that a plaintiff who establishes differential treatment could state an equal protection claim by showing 'either that there was no rational basis for the unequal treatment received, or that the [unequal treatment] was motivated by

animus." *Ibid*., quoting Harlen, *supra*, at 500.  *Cf*., Barstow v. Shea, 196 F. Supp. 2d 141, 148 (D. Conn. 2002) (Arterton, J.); Oneto v. Town of Hamden, 169 F. Supp. 2d 72, 80-81 (D. Conn. 2001) (Arterton, J.); Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir. 2001); Carpenteria Valley Farms, Ltd. v. County of Santa Barbara, 334 F.3d 796, 802 (9th Cir. 2003).

The evidence delineated above supports the plaintiff's claim that the defendants intentionally treated her differently, in material respects, from other similarly situated teachers and that there was no rational basis for such disparate treatment.  She is, therefore, entitled to a jury determination of this claim.

The individual defendants[2] claim that they are entitled to the benefit of the affirmative defense of qualified immunity from liability on the plaintiff's two constitutional claims.  "A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him is not prohibited by federal law...; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct...; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was

---

[2] Qualified immunity does not protect municipalities or officials sued in their official capacities.  It protects only individuals.  Owen v. City of Independence, 445 U.S. 622 (1980); Ford v. Reynolds, 316 F.3d 351, 356 (2nd Cir. 2003).

taken."  O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 36 (2nd Cir. 2003)

(citations, quotation marks and ellipses omitted).

"The qualified immunity defense may be upheld as a matter of law when the

evidenced is such that, even when it is viewed in the light most favorable to the

plaintiffs and with all reasonable inferences drawn in their favor, no rational jury

could fail to conclude that it was objectively reasonable for the defendant to believe

that she was acting in a fashion that did not violate such a right."  Gottlieb v. County

of Orange, 84 F.3d 511, 518 (2nd Cir. 1996); Barstow v. Shea, 196 F. Supp. 2d 141,

149 (D. Conn. 2002) (Arterton, J.).

The burden of pleading and proving a qualified immunity defense rests squa-

rely and exclusively upon the defendant.  Gomez v. Toledo, 446 U.S. 635, 640

(1980); Harlow v. Fitzgerald, 457 U.S. 800 at 815 (1982); Schechter v. Comptroller

of the City of New York, 79 F.3d 265, 270 (2d Cir. 1996); Black v. Coughlin, 76 F.3d

72, 75 (2d Cir. 1996); Castro v. United States, 34 F.3d 106, 111 (2d Cir. 1994);

DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 35 (1st Cir. 2001); Buenrostro v. Colla-

zo, 973 F.2d 39, 44 (1st Cir. 1992); Tatro v. Kervin, 41 F.3d 9 (1st Cir. 1994); Maul

v. Constan, 928 F.2d 784 (7th Cir. 1991); Houghton v. South, 965 F.2d 1532, 1536

(9th Cir. 1992); Benigni v. City of Hemet, 868 F.2d 307, 313 (9th Cir. 1988).

For the reasons amply discussed above, the law was clearly established in

2002 and 2003 that the very conduct which the plaintiff's evidence shows was

engaged in by the defendants, was constitutionally prohibited.  Their qualified

immunity defense cannot avail them at this stage.

Finally, the defendant District claims that there is insufficient evidence to

attribute the acts of the other defendants to it under the doctrine of Monell v.

Department of Social Services, 436 U.S. 658, 690 (1978).  The defendant's

argument is unavailing, because the evidence clearly shows that the Board of

Education itself terminated the plaintiff, upon the recommendation of the individual

defendants, in the face of clear evidence supporting all of the plaintiff's claims here.

"[A] local government may not be sued under § 1983 for an injury inflicted

solely by its employees or agents.  Instead, it is when execution of a government's

policy or custom, whether made by its lawmakers or by those whose edicts or acts

may be fairly said to represent official policy, inflicts the injury that the government

as an entity is responsible under § 1983."  Monell v. Dept. of Social Services, 436

U.S. 658, 694 (1978).  "[A] plaintiff seeking to establish a section 1983 claim against

a municipality based on a 'ratification' theory must allege that a municipal official

with final policymaking authority approved the subordinate's decision and the basis

for it."  Baskin v. City of Des Plaines, 138 F.3d 701, 705 (7th Cir. 1998).  Citing

Kernats v. O'Sullivan, 35 F.3d 1171, 1182 (7th Cir. 1994); Wilson v. City of Chicago,

6 F.3d 1233, 1240 (7th Cir. 1993); and Cygnar v. City of Chicago, 865 F.2d 827, 847

(7th Cir. 1989). "A decision by municipal policymakers on a single occasion may

result in municipal liability under 42 U.S.C. § 1983 for actions it officially sanctioned

or ordered." <u>Dixon v. Lowery</u>, 302 F.3d 857, 867 (8th Cir. 2002); <u>Williams v. Butler</u>,

863 F.2d 1398, 1401 (8th Cir. 1988).

      The motion for summary judgment must be denied in all respects.


      Respectfully submitted:


_____
      JOHN R. WILLIAMS (ct00215)
      Williams and Pattis, LLC
      51 Elm Street, Suite 409
      New Haven, CT 06510
      (203) 562-9931
      Fax: (203) 776-9494
      E-Mail: jrw@johnrwilliams.com
      Attorney for Plaintiff


**<u>CERTIFICATION OF SERVICE</u>**

A copy hereof was mailed, on the above date, via first-class mail, postage prepaid, to Mark J. Sommaruga, Esq., Sullivan, Schoen, Campane & Connon, LLC, 646 Prospect Avenue, Hartford, CT 06105.


_____
      JOHN R. WILLIAMS