Brown vs Reginal School District 13

12/1/2003

Susan Brown

Page 2

1
2
      APPEARANCES:
3
      REPRESENTING THE PLAINTIFF:
4    Williams & Pattis, LLC
      51 Elm Street
5    New Haven, CT 06510
      By:  Ms. Christy Doyle, Attorney at Law
6
      REPRESENTING THE DEFENDANT:
7    Sullivan, Schoen, Campane & Connon
      646 Prospect Avenue
8    Hartford, CT 06105-4286
      By:  Mr. Mark J. Sommaruga, Esq.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

```
 1            (Deposition commenced at 10:40 a.m.)
 2
 3            SUSAN BROWN, Deponent, having first been
 4            duly sworn, deposes and states as follows:
 5
 6
 7            DIRECT EXAMINATION BY MR. SOMMARUGA:
 8       Q.  Good morning.
 9       A.  Good morning.
10       Q.  For the record, my name is Mark Sommaruga
11   from the law firm of Sullivan, Schoen, Campane &
12   Connon.  I'm here on behalf of the Defendants in
13   the lawsuit of Brown versus Regional School
14   District No. 13, et al., and we're here for         a
15   deposition.
16            Have you ever been deposed before?
17       A.  No.
18       Q.  I'm going to just give you just I think a
19   fair summary of what goes on at these.  As you
20   see, we have a court reporter here.
21       A.  Right.
22       Q.  That person, with all due respect to anyone
23   else in the room, is the most important person in
24   the room, so it's important that we make things as
25   clear for him as possible.
```

Brown vs Reginal School District 13

12/1/2003                                                                 Susan Brown

Page 6

1    A lot of times, and I include myself in
2  this, people tend to talk past each other, talk on
3  top of each other. It's important that you allow
4  me to finish my question, and I also allow you to
5  finish your response, and I'll try my best. I'm
6  sure I may slip up from time to time, but I'll try
7  my best and ask you to do the same.
8    A lot of times in normal conversation we
9  will nod, shrug, make a gesture. I would just ask
10 that you verbalize or make an audible response
11 just because, again, the court reporter needs to
12 make a record for this, and it's tough for him to
13 intuit what a shrug, a nod or a shake is.
14   And also another thing, too, is often times
15 in everyday conversation we from time to time
16 instead of saying yes or no, we will say un-huh or
17 hun-uh. Again, please let's try to just stick to
18 as clear things as possible.
19   Now, the court reporter here is taking down
20 your testimony. It's under oath and may be used
21 at trial or in these proceedings.
22   Now, just to be clear, to your left I see
23 you have an attorney here, correct?
24 A.  Yes.
25 Q.  Are you on any medications today?

1   seemed to be.
2   Q.  Were any teachers spreading negative rumors
3   about you, that's the term you used, negative
4   rumors, to your knowledge?
5   A.  At the time, to my knowledge, no.
6   Q.  I'm going to have you look at, again, Page
7   5.  There's some comments here.  I'm going to ask
8   you just to reflect upon them, whether you agree,
9   disagree and tell me how?
10      It says in the first sentence, "The year has
11  been both a successful year and a difficult one."
12      I mean, do you agree with that assessment?
13  A.  Yes.
14  Q.  It says here further on down the line in the
15  last line of that paragraph, "However, when
16  students have difficulty with behaviors, your
17  performance is not the same quality as with
18  students that possess only learning disability
19  profile."
20      Do you agree with that assessment?
21  A.  No.
22  Q.  And why don't you agree with it?
23  A.  Because the implication is that I could not
24  handle students that had difficulty with
25  behaviors, difficult behavior.

1  Q. Now, when you received this evaluation, did
2  you have a meeting with Dr. Richardson?
3  A. I had a meeting with Dr. Richardson and
4  Susan Viccaro.
5  Q. For this particular evaluation?
6  A. Right.
7  Q. How long was the meeting?
8  A. 15 minutes.
9  Q. What do you recall about that meeting,
10 everything you recall that was stated?
11 A. Everything?
12 Q. Yes.
13 A. I remember I went to the meeting. Dr.
14 Richardson, Susan Viccaro were there. I remember
15 thinking to myself it was unusual because the year
16 before Dr. Richardson had done the evaluation with
17 me.
18    Other teachers that I know of that have been
19 evaluated, even special education teachers, it was
20 always Dr. Richardson. I thought that was unusual
21 that Susan Viccaro was there.
22    I remember sitting there. Susan Viccaro
23 started speaking. Dr. Richardson, I believe,
24 didn't say anything.
25    Susan, I think, paraphrased some of what's

Page 51

1   A.  Who would perform them or who did perform
2   them?
3   Q.  Who did perform them?
4   A.  I believe Dr. Richardson did the first one
5   in the fall.  Susan Viccaro did the next one.
6   Q.  Is it your understanding that special
7   education staff-- that the person responsible for
8   evaluating special education staff would still be
9   the building principal?
10  A.  I'm sorry, could you repeat that?
11  Q.  Let me rephrase the question.  In terms of--
12  and, again, to the best of your knowledge, as to
13  your colleagues who are special educators --
14  A.  Right.
15  Q.  -- that's the term to use?  Do you know if
16  other individuals who are special educators had
17  their observations performed by Ms. Viccaro?
18  A.  In the particular building, Strong School?
19  Q.  Yes.
20  A.  No.
21  Q.  Do you have any personal-- you just don't
22  know.  Maybe let me rephrase the question.  Did
23  you have any personal knowledge --
24  A.  I don't believe any of the special education
25  teachers had Susan Viccaro observing them.

Page 52

```
1    Q.  Is that based upon conversations with other
2    special education teachers?
3    A.  I believe so.
4    Q.  I'm going to show you what will be Exhibit
5    8.
6
7    (Defendant's Exhibit 8, Document, marked for
8    identification.)
9
10   Q.  (BY MR. SOMMARUGA)  I want to go over the
11   first two pages with you, first of all, whenever
12   you're ready.
13   A.  I'm ready.
14   Q.  Do you remember receiving this document?
15   A.  Yes.
16   Q.  Did you have a chance to sit down and speak
17   with anyone regarding this document?
18   A.  Okay, could you clarify when?
19   Q.  In terms of you testified earlier, and I
20   hope I'm not misstating your testimony, that when
21   you had received the evaluations or you had
22   meetings at the end of the year with your
23   evaluators.
24   A.  Correct.
25   Q.  Did you have a meeting with your evaluator
```

```
1    Q.  Did you ever file a grievance under the
2   collective bargaining agreement?
3    A.  No.
4
5   (Defendant's Exhibit 11, Response, marked for
6   identification.)
7
8    Q.  (BY MR. SOMMARUGA)  This is a response.
9   Let's go to the first page.  This is the response
10  you prepared, I guess, to a previous memo,
11  correct?
12   A.  Yes.
13   Q.  Now, the first part of it you deal with the
14  issue of a non-- it says, "In response to your
15  memo regarding non attendance at a department
16  meeting."
17       You state here in the middle here, I just
18  want to ask you about one sentence, you state
19  here, the second line, it should be, at the end,
20  "At the many department meetings I've attended
21  over the last three years I have observed numerous
22  and habitual absences by other special education
23  teachers."
24       Is that your position?
25   A.  Yes.
```

Brown vs Reginal School District 13

12/1/2003                                                   Susan Brown

Page 86

1    Q.  Do you know, do you have any personal
2    knowledge as to whether these individuals received
3    a memo in their files about their failure to
4    attend the meeting?
5    A.  I don't know.
6    Q.  Page 3, I'll show you specifically here, it
7    says, "In the past I have been constantly berated
8    with a barrage of false accusations and twisted
9    facts, badgered and demeaned, asked to own things
10   that I did not do and accept the responsibility
11   for the actions of others among other things."
12           First of all, who was the one asking you to
13   own things you did not do?
14   A.  Most of the time Susan Viccaro.
15   Q.  Who was the one that berated you with a
16   barrage of false accusation and twisted facts?
17   A.  Susan Viccaro many times, a little bit Ann
18   Richardson.
19   Q.  You said "badgered and demeaned." How would
20   you be badgered and demeaned?
21   A.  I would be called in to meetings with Susan
22   Viccaro and Dr. Richardson, asked about things.
23   When I didn't give the response that it seemed
24   like they were looking for, I was asked again and
25   again and again.  It was almost like I was being

1   interrogated.
2       I remember one specific meeting that I was
3   in in the fall of 2002. It was a meeting that was
4   called in response to my having responded to two
5   earlier memos that Susan Viccaro had written me,
6   and I was-- originally it was supposed to be--
7   Susan said the reason for the meeting was we were
8   just going to-- she wanted to respond to my
9   responses to the memos, but it turned out to be
10  she kept asking me-- and Candy Brickley the union
11  rep was there, too.
12      She kept asking me, you know, "Why did you
13  write these? I'm finding your responses to be
14  hostile." And she kept saying, you know, "Why did
15  you write these? Why did you write these?" And I
16  would just say, "Well, because I wanted to give my
17  side of the story." And she just kept saying
18  that.
19      She at one point she said I should not be
20  responding to these memos. She suggested that if
21  I had anything, any responses, to the memos, that
22  I should tell her verbally.
23      She would ask me things, and I would start
24  to respond, and she would cut me off, and she'd
25  say, "Just-- you know, just tell me yes or no."

Page 88

1  And then she would say things like I'm not--
2  she said something like with the memos, she was
3  asked by Candy Brickley if it was usual procedure
4  for her to memo a teacher about anything that she
5  wanted to convey to the teacher especially in a
6  disciplinary mode. And Susan had said, "No, it's
7  not my usual procedure, but with her," meaning me,
8  "I'm going to memo her, and I'm going to continue
9  to memo her."
10  And, you know, she would get very hostile,
11  very-- you know, just kind of berate me, yell at
12  me. I would get accused of things I didn't say.
13  I would get accused of things I didn't do. I was
14  asked to own things that other people had said I
15  did, and when I said didn't do them, I didn't say
16  them, she'd say, "You're not owning it. You're
17  not owning it," you know.
18  People knew I was having these constant
19  meetings. It was very humiliating for me to keep
20  being, you know, dragged into meetings, giving
21  everyone around me the impression that I wasn't
22  doing my job or I was always in trouble.
23  It was just-- it was-- it was just very
24  draining and demeaning to work very hard and have
25  to constantly be accused of things and being, you

Page 97

1  nothing do with Ms. Brown's performance, you have
2  been harassed, and your professional character,
3  reputation and good name have been tarnished."
4        How has your professional character,
5  repetition and good name been tarnished?
6     A.  How has it been tarnished?
7     Q.  Yes, at the time of this writing of this
8  letter.  This is before you were non renewed.
9     A.  In all my evaluations I was cited for things
10 that I was not responsible for that either did not
11 occur or they were isolated incidents made to seem
12 serious.
13       Some things were trivial, everyday
14 occurrences that everyone at the school had done
15 from time to time, yet I was being called to task
16 on everything.
17       My reputation within the school was being
18 degraded because after being called in to constant
19 meetings-- I mean, people knew that, you know, I
20 was always in trouble for some reason.  That would
21 undermine my authority with the teacher assistants
22 because they're not going to listen to and respect
23 someone who they thought their principal and the
24 director of special education was always having
25 disciplinary meetings about.

Page 98

1   Q.  Let me ask you this, and some of this is
2   reflecting on this letter, but some of it may also
3   be reflecting on the memos you wrote previously,
4   so they're your words as opposed to his words.
5   But it says, "For reasons that have nothing to do
6   with Ms. Brown's performance" that you have been
7   subject to various treatment.
8       Was Ms. Viccaro-- actually, were Ms. Viccaro
9   and Dr. Richardson responsible for evaluating your
10  performance?  They were responsible?
11  A.  Yes.
12  Q.  If there was performance concern, was it
13  their responsibility to put that performance
14  concern on a written evaluation?
15  A.  Legitimate concerns about performance, yes.
16  Q.  Now, do you have any personal knowledge as
17  to whether Ms. Viccaro's concern about your
18  performance was not legitimate in her own mind?
19      MS. DOYLE:  I'm going to object to the
20  form.  You're asking her to speculate about what
21  was going on in Ms. Viccaro's mind.  She would
22  have no idea.
23  Q.  (BY MR. SOMMARUGA)    Do you have any
24  personal knowledge as to what Ms.-- why Ms.
25  Viccaro was treating you the way she was treating

12/1/2003                                                    Susan Brown

Page 103

1   letter?
2     A.   That was the gist of it.  I don't know.
3     Q.   What happened at this meeting with Dr.
4   Breck, the one that occurred, you said, the
5   following Monday?
6     A.   Un-huh.
7     Q.   How long was the meeting?
8     A.   Five minutes maybe.
9     Q.   What happened during the meeting?
10    A.   He just-- you know, he said, you know, that,
11  "I'm going to-- I'm just telling you that I'm
12  going to recommend to the-- you know, the board of
13  ed that your contract be not renewed."
14         Dr. Richardson was there.  Susan Viccaro was
15  not.  And Candy Brickley the union rep was there.
16    Q.   Did you say anything to him or --
17    A.   No.
18    Q.   It was just he told you that, and that was
19  it?
20    A.   Correct.
21    Q.   Did he give you any reasons for why he was
22  doing this at this point in time?
23    A.   I think he said that Dr. Richardson and
24  Susan Viccaro had recommended that to him.
25    Q.   Now, we mentioned about the November 12th,

Brandon Smith Reporting Service

811b5f0a-02cc-4d18-9f1b-0e14b568091d

Brown vs Reginal School District 13

12/1/2003                                          Susan Brown

Page 104

1    letter, this, and then you have this meeting with
2    Dr. Breck.
3           Between this letter and the meeting with Dr.
4    Breck did you have any contact with Dr. Breck
5    besides the casual contact you had previously?
6    A.   No.
7    Q.   Now, I'd asked you previously about the
8    roles of Dr. Richardson and Ms. Viccaro in
9    questions about people-- I think one time you
10   referred to people planning to make sure you had
11   an unsuccessful year.  That was your-- I think
12   what you wrote in your memo.
13          Do you believe that Dr. Breck was planning
14   for you to have an unsuccessful year?
15   A.   I don't know.
16   Q.   Do you have any personal knowledge as to
17   whether Dr. Breck had any personal animus against
18   you?
19   A.   I don't know.
20          MR. SOMMARUGA:  This is the next exhibit,
21   which will be Exhibit 14.
22
23   (Defendant's Exhibit 14, Memo, marked for
24   identification.)
25