Case 3:03-cv-00420-MRK   Document 34-5   Filed 03/08/2004   Page 1 of 15
Brown vs Reginal School District 13
12/1/2003                                                    Susan Brown

Page 117

1  that there was something going on, but never, you
2  know, inquired or asked me anything about it.
3      Q.  Did you ever approach Dr. Breck regarding
4  your various problems?
5      A.  I thought about it, and I decided not to.
6      Q.  So again, I don't want to summarize your
7  position, because I could be completely wrong, but
8  it's your position that Dr. Breck should have
9  somehow addressed the circumstances when --
10     A.  Yes.  I don't know.  I thought many times of
11 going to see him and trying to explain to him what
12 was going on, but the feedback that I got, when I
13 mentioned it to several colleagues and also to my
14 union representative, was the fact that maybe if I
15 go see Dr. Breck, if he doesn't know what's going
16 on-- this was before the attorney sent the letter,
17 because at that point I just had no where else to
18 go.
19         I just didn't know what to do, and I was
20 advised by the people that I asked their opinion.
21 They said that I shouldn't because they felt that
22 Dr. Breck always supported his administrators, and
23 it would not do me any good to do that.  It would
24 do me more harm than good.
25     Q.  So who told you that?  Was that your union

Page 118

1  who said that he always supported administrators?
2      A.  My union rep and several colleagues.
3      Q.  Regardless of the merits, he would support
4  the administration?  That's what you were told?
5      A.  That's kind of the impression that I got,
6  yes.
7      Q.  I'm just going to go through your Complaint,
8  and it should be a good way to wrap this up back
9  to Exhibit 1, the starting place.
10         A lot of this you've already addressed, but
11 under the First Count, if you go to-- by the way,
12 tell John to number his Complaints from now on
13 with page numbers.  That's always been a pet peeve
14 of mine with him.  So I can't say go to Page 3.
15         MS. DOYLE:  Which paragraph in Count 1?
16         MR. SOMMARUGA:  Count 1, Paragraph 8.
17     Q.  (BY MR. SOMMARUGA)  And actually there's a
18 bunch here, but I think all I care-- all I really
19 want-- you've answered most of it, to be honest,
20 but one thing you claim that the district has
21 done, as part of a continuing pattern of abuse,
22 includes humiliating you in front of your peers.
23         When have they done that?
24     A.  I've been like, say, in the hallway, and
25 I've-- Dr. Richardson several times has yelled at

1  me. I was called into the many meetings. Many of

2  the secretarial staff, the support staff and

3  colleagues knew I was being called in, knew I was

4  in the meetings.

5       I was called up to central office. Susan

6  Viccaro had called me up, you know, like many

7  times for, you know, meetings. I would have to,

8  you know, sit there in the waiting room, and

9  everyone knew that I was up there being called on

10  the carpet again, you know, by Susan Viccaro.

11       People told me-- one day I was sick, and I

12  came in, and, you know, the whole school was

13  buzzing about, "Dr. Richardson's going to have

14  your head." So just all that type of stuff.

15       When I had to go for this mediation with

16  Renee, it was just a very humiliating procedure.

17  Just always, always at every turn being approached

18  like I was doing something wrong, and I wasn't

19  doing my job, and I was like, you know, always had

20  to be reprimanded for something, and everyone in

21  the whole school knew it all the time. So it was

22  very humiliating.

23  Q. By the way, did you ever request a transfer?

24  A. Yes, I did.

25  Q. When did you request a transfer?

Brown vs Reginal School District 13

Susan Brown

12/1/2003

Page 120

1    A.  At the end of my second year, which was the
2  year that I got this first evaluation. Actually,
3  it was even before I got the evaluation. But when
4  all those-- the kind of rumors started and the
5  gossiping through the school that year, and after
6  I had sought help from Dr. Richardson and Susan
7  Viccaro, but it didn't seem to matter, and then I
8  started being called into meetings, and I just saw
9  this as, you know, possibly a no win situation.
10       So I-- Susan Viccaro, my first year, after
11  my first year, I had wanted to transfer to another
12  school, just because I wanted to work with younger
13  children. And she had said that she wanted me to
14  stay that second year because we had a difficult
15  student coming in, which was that student who had
16  the one-to-one aide Cary Kuehnle. And she just
17  felt that this difficult student coming in would
18  be best handled by myself.
19       She told me she had a lot of faith and
20  confidence in me. She said that, you know, I had
21  done a really good job. Dr. Richardson was really
22  happy with me. She said stuff like Dr. Richardson
23  told her that I was the glue that held my academic
24  team together and all this stuff, and she wanted
25  me to stay one more year to handle this difficult

Case 3:03-cv-00420-MRK   Document 34-5   Filed 03/08/2004   Page 5 of 15
Brown vs Reginal School District 13
12/1/2003                                                           Susan Brown

Page 121

1  student.
2         And then she said after that year, she said,
3  if there's an opening, she would definitely
4  transfer me to another school and definitely
5  within two years, if I wanted to go to an
6  elementary school, I could.
7         At the end of that second year, after all
8  these things started to happen, that second year
9  there was an opening posted at another school.
10        I applied for the position. The date
11 closed. I didn't hear anything. I was called by
12 Susan Viccaro the day after all the outside
13 applicants had been interviewed, and she called me
14 to set up an interview.
15        I went, and I had the interview. She said--
16 she called me that night. She said I did really
17 well, and I was-- it was down between myself and
18 one other candidate, and she wanted me to do a
19 lesson at the school.
20        I had asked her, since I had already been--
21 you know, I'd had like previous observations, was
22 that really necessary because after five classroom
23 observations, you know, they really knew how I
24 taught. And she said, "Well, it's-- you know,
25 it's a younger level," even though that the kids

1  were only like a year younger.
2      I went in. I did the lesson. Supposedly,
3  by some feedback that I got from some of the
4  teachers who were there, they said I did a really
5  good job.
6      About a week and a half went by, and I was
7  called by the principal of that school, and he
8  told me he was sorry but I didn't get the job.
9  Q. Did anyone ever-- let me ask you this, where
10  is the Complaint? You have it, right, in front of
11  you?
12  A. Yes.
13  Q. You allege that you were treated differently
14  or significantly differently-- or significantly
15  different from the treatment accorded by the
16  Defendants to other teachers similarly situated to
17  you.
18      What knowledge do you have that other
19  teachers were treated differently than you?
20  A. There was-- first of all, there was no other
21  teacher in the school that was being treated the
22  way I was being treated. There was no one that
23  was constantly being called into meetings. There
24  was no one that was being scrutinized as I was
25  being scrutinized.

1      A specific example of, say, a different type
2   of treatment was actually going back to that
3   meeting that you had asked me about where in one
4   of the responses I had said that I was aware that
5   there were other teachers who had missed those
6   department meetings. And the meeting after that
7   first department meeting that I missed there was
8   another teacher who was sitting at my table at the
9   meeting, and while Susan Viccaro was speaking to
10  the group, she kind of interrupted Susan and said,
11  "What article are you talking about?" And Susan
12  said, you know, "The article that I gave out at
13  the last meeting for everybody to read and bring
14  back to the meeting." And she said, "Oh, I don't
15  have that, you know, article." And Susan said,
16  "Oh, that's because you missed the last meeting.
17  I'll just get that article to you."
18     And this teacher who was sitting at my
19  table, she said, "Oh, we completely forgot, you
20  know, the meeting," she says, "you know, all of
21  the whole special ed staff at my school." She was
22  saying that this elementary school had completely
23  forgot about this meeting and missed the meeting.
24     So that was kind of where I received a memo,
25  was called up to the office, I was told, you know,

1  that since I missed the meeting she would have to
2  go over all these things with me about the
3  meeting, you know.
4      I was berated for missing the meeting, and
5  yet here was a teacher who said, "Oh, my whole
6  staff just forgot about the meeting." And, you
7  know, I didn't not just go. I had a legitimate
8  reason why I didn't or couldn't go.
9      Q. Do you know the staff members who missed the
10 meeting if they received any memo in their files?
11     A. I would say by the way it was so casual that
12 nobody received any. It was a month later, and
13 obviously they hadn't received a memo.
14     Q. The evaluation instrument do you know if the
15 same evaluation instrument was used for other
16 teachers, not the response but the instrument
17 itself, the form?
18     A. I don't know.
19     Q. Now, I asked you about your relationships
20 with Dr. Breck, Dr. Richardson, Ms. Viccaro and
21 your teacher assistants. Were there any other
22 teachers in the school system-- you mentioned-- I
23 think you mentioned Renee Brazcezki --
24     A. Brazcezki.
25     Q. -- that you felt were trying to harm you?

1   A.  That's what Dr. Richardson had told me.

2   Q.  Were there any other teachers?

3   A.  Not that I'm aware of.

4   Q.  Now, in your Complaint you refer to-- Count

5   3 and Count 4 refers to a claim of what we call,

6   the lawyers call, intentional infliction of

7   emotional distress and negligent infliction of

8   emotional distress.

9       First of all, it says you've suffered severe

10  emotional distress. Could you please describe

11  that?

12  A.  That second year, when all this started to

13  surface, it was very-- started to be very mentally

14  exhausting and draining. When I started getting

15  called into meetings, when I started getting memos

16  that just came from nowhere, I would start to have

17  these physical symptoms like almost feeling very

18  body feeling, like very warm and flushed type of

19  thing. Then it was almost like I-- you know, it

20  was difficult to kind of focus when I kind of felt

21  that way.

22      I started getting headaches, and I never got

23  headaches before. I had kind of colitis type

24  stomach ailments. Some hair started falling off,

25  you know, that type of stuff.

1   I would go home. I would just-- I would
2   just be like mentally and physically exhausted
3   from dealing with all the stuff all the time every
4   single day, things that just came out of nowhere,
5   always, you know, defending myself on everything I
6   said and did.
7   Plus, trying to do my job, it was almost
8   like dealing with this whole thing that took on a
9   life of its own. It was like a job, and then I
10  was trying to do my real job on top of it, and I
11  would just go home, and I was just mentally and
12  physically exhausted. And I would just-- I
13  would-- like I had so much to do that night
14  because I had to do stuff for the day. If I had a
15  memo, I had to like, you know, respond to it. I
16  had all these things constantly.
17  And I would like sit in the chair and
18  literally I would fall asleep. Then I'd wake up
19  like at one o'clock in the morning. I was, oh, my
20  God, I got to do this. Then I'd go to school, and
21  I'd be exhausted because I didn't really sleep
22  that night.
23  And every single day and night it was like
24  that, and I'd get to Friday, and I'd just crash,
25  and I'd sleep. And then I'd get up on Saturday,

Case 3:03-cv-00420-MRK   Document 34-5   Filed 03/08/2004   Page 11 of 15
Brown vs Reginal School District
12/1/2003
Susan Brown

Page 127

1   and I'd start the whole thing again where I'd be,
2   you know, preparing for the Monday and just
3   dealing with all this stuff and, you know, making
4   notes of what Dr. Richardson told me I'm supposed
5   to be taking notes of.
6       And it was just it was like it was just this
7   continuous cycle of-- you know, it was pretty
8   awful, and it lasted, you know, like, you know,
9   several years.  And it was just the most awful
10  experience I've ever been through in trying to do
11  my job.  And I did a good job, and yet I had to
12  just fend off all this stuff all the time.
13      Q.  Did you suffer emotional distress due to the
14  termination, the actual termination?
15      A.  Oh, yeah, of course.
16      Q.  Let me ask you this, did you-- I'm probably
17  going to see all of this information tomorrow, so
18  I'll just keep this as brief as possible.
19      Did you seek medical treatment for any of
20  your conditions related to your emotional
21  distress?
22      A.  I didn't seek mental-- I'm sorry.
23      Q.  Medical, mental, physical.
24      A.  No.  I mean, I was experiencing where my
25  teeth were like-- I think there was so much

```
 1   stress, my teeth were constantly breaking and
 2   chipping, and I had to go to the dentist many
 3   times to kind of, you know, repair that.
 4        I had gone to the doctor several times just,
 5   you know, to go, and my blood pressure had-- you
 6   know, I had always had very like low blood
 7   pressure, and it was elevated every time I went,
 8   you know.
 9   Q.  I have to ask you this.  Have you suffered
10   emotional distress previous to the emotional
11   distress you allege you suffered as a result of
12   the treatment afforded to you by Region 13?
13   A.  No.
14   Q.  Do you currently have health insurance from
15   the City of Hartford?
16   A.  Yes.
17   Q.  You allege that, "The Defendants' conduct
18   described above in this Complaint has been extreme
19   and outrageous and carried out with the knowledge
20   and intent that it probably will cause the
21   Plaintiff to suffer emotional distress."
22        What personal knowledge do you have that the
23   Defendants in this case intended to cause you an
24   emotional distress?
25   A.  Well, first of all, I mean, anyone with any
```

```
 1   sense would know that what was done to me and kept
 2   being done to me on a daily basis would definitely
 3   cause anybody emotional distress.
 4        Q.  How about Dr. Breck?
 5        A.  What about Dr. Breck?
 6        Q.  Well, what knowledge do you have that Dr.
 7   Breck intended to inflict emotional distress upon
 8   you?
 9        A.  I would think that after knowing that my
10   attorney had written a letter to Susan Viccaro
11   obviously stating that, you know, stuff was going
12   on like this, and then just having this letter
13   sent to me saying that my contract was non
14   renewed, which was a very-- which my union rep
15   said was a very unusual circumstance the way it
16   was done.
17            She said it always had been in the past
18   that, if Susan was going to non renew someone, she
19   would meet with them, and then after she met with
20   them and discussed it and discussed things and
21   discussed options and reasons, then the union rep
22   would get a call from Dr. Breck, and then she
23   would-- a meeting would be set up.  I guess she
24   and Dr. Breck would set up this meeting where the
25   person that was non renewed and her and Dr. Breck
```

1  would kind of have a meeting.
2         She would know.  She would know like a week
3  or a week and a half to two weeks before this
4  occurrence happened.  She would talk-- so this
5  just, according to my union rep, it happened very
6  differently, she said, and she's been there for 30
7  years, and she's the president of the union.  She
8  said she's never seen a non-renewal take place
9  like this.
10     Q.  Now, just to be clear, you said you got a
11  notice from Dr. Breck the first Monday of March,
12  correct?
13     A.  I got a call, too.
14     Q.  A call?
15     A.  As I think about it, I got a call the day
16  that Susan Viccaro received the request from
17  Attorney Rosenblatt for my file.  I got a call
18  from his office saying that they wanted to meet
19  with me.
20         His secretary called me, actually, said Dr.
21  Breck wanted to meet me on Wednesday, wanted me to
22  come to his office on Wednesday.  I asked her,
23  "Why?"  She said she didn't know.
24         Then the next day I received a letter saying
25  that, you know, "You're hereby requested to appear

Page 135

| | |
|---|---|
| 1 | STATE OF CONNECTICUT |
| | I, VINCENT J. DELARIA, a Registered |
| 2 | Professional Reporter/Notary Public within |
| | and for the State of Connecticut, do hereby |
| 3 | certify that I took the deposition of SUSAN |
| | BROWN, on December 1, 2003, at the offices |
| 4 | of Sullivan, Schoen, Campane & Connon, 646 |
| | Prospect Avenue, Hartford, Connecticut. |
| 5 | |
| | I further certify that the above-named |
| 6 | deponent was by me duly sworn to testify to |
| | the truth, the whole truth and nothing but |
| 7 | the truth concerning his/her knowledge in |
| | the matter of the case of, Susan Brown vs. |
| 8 | Regional School District 13, now pending in |
| | the US District Court District of |
| 9 | Connecticut. |
| 10 | I further certify that the testimony was |
| | taken by me stenographically and reduced to |
| 11 | typewritten form under my direction by |
| | means of COMPUTER ASSISTED TRANSCRIPTION; |
| 12 | and I further certify that said deposition |
| | is a true record of the testimony given by |
| 13 | said witness. |
| 14 | I further certify that I am neither |
| | counsel for, related to, nor employed by |
| 15 | any of the parties to the action in which |
| | this deposition was taken; and further, |
| 16 | that I am not a relative or employee of any |
| | attorney or counsel employed by the parties |
| 17 | hereto, nor financially or otherwise |
| | interested in the outcome of the action. |
| 18 | |
| | WITNESS my hand and my seal this 9th day |
| 19 | of December, 2003. |
| 20 | |
| 21 | |
| 22 | |
| | Vincent J. DeLaria, RPR, LSR |
| 23 | Notary Public |
| 24 | My Commission Expires: |
| | March 31, 2005 |
| 25 | |